Craig A. Brandt (SBN 133905)
LAW OFFICE OF CRAIG A. BRANDT
5354 James Avenue
Oakland, CA  94618
Telephone: (510) 601-1309
Email:  craigabrandt@att.net

Attorney for Plaintiff
EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>CORDEIRO VAULT CO., INC., a California corporation, and DOES 1-10, inclusive,<br><br>Defendant. | Case No:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

**INTRODUCTION**

1. This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendant for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2. Defendant Cordeiro Vault, Co., Inc. ("CORDEIRO VAULT") maintains two separate industrial sites in Vallejo, California and each location is a subject of this suit.

3.    On or about July 2, 2022, EDEN provided a Notice of Defendant's violations to CORDEIRO VAULT, by certified mail, at 1431 Valle Vista Avenue, Vallejo, California for the ("the Ryder Street Facility") and at 281 5th Street, Vallejo, California ("the 5th Street Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

4.    On or about July 2, 2022, EDEN provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board"), (4) Port of San Francisco, and (5) CORDEIRO VAULT, Facility Managers.

5.    A copy of EDEN's Notices of Intent to Sue is attached hereto as Exhibit A and Exhibit A-1 and are incorporated herein by reference. (Exhibit A and Exhibit A-1, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").")

6.    More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendant, the State Water Resources Control Board ("State Board"), and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(g).

**JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief

1  requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C.

2  sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil

3  penalties).

4      8.    The Permit under which this case arises is a Federally required permit based upon

5  California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment*

6  *Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of*

7  *Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016).)

8      9.    By its express language, a violation of the State permit constitutes a per se violation of

9  the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ,

10  NPDES Order No. CAS000001, Section XXI.A)

11     10.   Venue is proper because Defendant reside in and the events or omissions giving rise to

12  EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper

13  because the Facility's CWA violations have occurred and are occurring within the District. 33

14  U.S.C. § 1365(c)(1).

**PARTIES**

16     11.   Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an

17  environmental membership group organized under the laws of the State of California as a limited

18  liability company on June 1, 2018.  EDEN previously existed as an unincorporated

19  environmental citizen's association, with members who remain associated with EDEN as of the

20  date of the filing of this Complaint.

21     12.   EDEN's organizational purpose is the protection, preservation and enhancement of

22  California's waterways.  Its mission is implemented by enforcing the provisions of the Federal

23  Clean Water Act and California's Industrial General Permit by seeking redress from

1  environmental harms caused by Industrial Dischargers who pollute the Waters of the United

2  States, through community education and citizen suit enforcement when necessary.

3      13.    EDEN's members donate their time and money resources to protect, enhance, and assist

4  in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their

5  tributaries located in California.

6      14.    EDEN has members that reside, work and pursue recreational activities near the affected

7  Receiving Waters. Defendant CORDEIRO VAULT discharges storm water into the San

8  Francisco Bay which is the "Receiving Waters" for the Facility. Eden members use those waters

9  and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing,

10  swimming, hiking, photography, nature walks and scientific study. Their use and enjoyment of

11  these natural resources have been and continue to be adversely impaired by Defendant's failure

12  to comply with the procedural and substantive requirements of the California Industrial General

13  Permit and Federal Clean Water Act.

14      15.    EDEN has standing as an association to bring this suit against Defendant, as at least one

15  of EDEN's current members is experiencing ongoing and continuing harm particular to him or

16  her as a specific result of Defendant's violations of the CWA, and the resulting adverse effects to

17  the environment and the Receiving Waters downstream from the Facility, and has experienced

18  such harm since at least the date that EDEN provided to Defendant a 60-day Notice of Intent to

19  Sue.

20      16.    Specifically, the individual member(s) who are experiencing harm from Defendant's

21  violations of the CWA are reluctant to utilize the Receiving Waters downstream from the

22  Facility as specified in Paragraph 13, above, due to the pollution caused by Defendant's

23  environmental violations that EDEN's members believe has entered into the Facility's Receiving

24

Waters; and the aesthetic and recreational interests of these members has been adversely impacted.

17.   Defendant's ongoing violations of the California Industrial General Permit and the CWA have and will continue to cause irreparable harm to EDEN and certain of its current members, for which they have no plain, speedy, or adequate remedy.  The relief requested will redress the ongoing injury in fact to EDEN and its members.  Litigation of the claims asserted and the relief requested in this Complaint will not require the participation in this lawsuit of individual members of EDEN.

18.   EDEN is informed and believes, and on such information and belief alleges, that Defendant CORDEIRO VAULT was formed on or about June 27, 1975, as a California corporation.

19.   EDEN is informed and believes, and on such information and belief alleges, that, Defendant CORDEIRO VAULT, on or about September 24, 2001, submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility. EDEN is further informed and believes, and on such information and belief alleges, that on or about December 23, 2015 Defendant CORDEIRO VAULT, submitted an NOT to be authorized to discharge storm water from the Facility under the California Industrial General Permit ("General Permit") and was assigned Waste Discharger Identification number ("WDID") 2 48I016830, for the Ryder Street Facility and WDID 2 48I016831, for the 5th Street Facility, according to the Regional Water Board's records.

**STATUTORY BACKGROUND**

20.   Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal

and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

21.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

22.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

23.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

General Permit

24.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.  The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between

1   1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit

2   maintains or makes more stringent the same requirements as the 1997 Permit.

3   25.   In order to discharge storm water lawfully in California, industrial dischargers must

4   comply with the terms of the General Permit or have obtained and complied with an individual

5   NPDES permit. 33 U.S.C. § 1311(a).

6   26.   The General Permit contains several prohibitions. Effluent Limitation Section V.A of the

7   General Permit requires dischargers to reduce or prevent pollutants in their storm water

8   discharges through implementation of the Best Available Technology Economically Achievable

9   ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control

10  Technology ("BCT") for conventional pollutants.  Discharge Prohibition Section III.C of the

11  General Permit prohibits storm water discharges and authorized non-storm water discharges that

12  cause or threaten to cause pollution, contamination, or nuisance.

13  27.   Receiving Water Limitation Section VI.B of the General Permit prohibits storm water

14  discharges to any surface or ground water that adversely impact human health or the

15  environment. Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D

16  of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any

17  applicable water quality standards contained in Statewide Water Quality Control Plan or the

18  applicable Regional Board's Basin Plan.

19  28.   In addition to absolute prohibitions, the General Permit contains a variety of substantive

20  and procedural requirements that dischargers must meet.  Facilities discharging, or having the

21  potential to discharge, storm water associated with industrial activity which have not obtained an

22  individual NPDES permit must apply for coverage under the State's General Permit by filing a

23

24

Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

29.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, Section X.C. These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

30.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, Section X.B.

31.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet Section I .1.

32.     Sections X.D – X.I of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

33.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, Section X.H.2.  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

34.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, Section X.H.4, 5.

35.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

36.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

37.     Section XI.B of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

38.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit Section XI.B.2.

39.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit Section XI.B.4.

40.     Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, Section XI.A.

41.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, Section XV.

42.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, Section XI.B.6.c.

43.     The United States EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water

discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

44.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

45.     The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("S.U."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L.

46.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit Section XII.A.

47.     When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit Section XII.C.

48.     For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the

exceedance is solely due to the presence of the pollutant in the natural background.  General

Permit Section XII.D.

49.    Section XVI.A. of the General Permit requires that all Dischargers must certify and

submit via SMARTS an Annual Report no later than July 15th following each reporting year

using the standardized format and checklists in SMARTS.

50.    Furthermore, Section XXI.L of the General Permit provides that all documents submitted

to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible

Person ("LRP") or Duly Authorized Representative ("DAR") of the Facility, with the following

certification:

"I certify under penalty of law that this document and all Attachments were prepared
under my direction or supervision in accordance with a system designed to assure that qualified
personnel properly gather and evaluate the information submitted. Based on my inquiry of the
person or persons who manage the system or those persons directly responsible for gathering the
information, to the best of my knowledge and belief, the information submitted is, true, accurate,
and complete. I am aware that there are significant penalties for submitting false information,
including the possibility of fine and imprisonment for knowing violations."

51.    Section XXI.N of the General Permit provides that any person who knowingly makes any

false material statement, representation, or certification in any record or other document

submitted or required to be maintained under the General Permit, including reports of

compliance or noncompliance shall upon conviction, be punished by a fine of not more than

$10,000, or by imprisonment for not more than two years, or by both.  *See also* Clean Water Act

section 309(c)(4)

San Francisco Bay Regional Basin Plan

52.    The Water Quality Control Board, San Francisco Bay Region has adopted the "San

Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by

1    Resolution No. R2-2010-0100, setting forth the Water Quality Standards ("WQS") and

2    beneficial uses for San Francisco Bay and its tributaries.

3        53.    The Beneficial Uses for San Francisco Bay are industrial service supply, shellfish

4    harvesting, fish migration, preservation of rare and endangered species, fish spawning,

5    commercial and sportfishing, estuarine habitat, wildlife habitat, recreational activities involving

6    contact with water, recreational activities involving proximity to water, and navigation. *See*

7    Basin Plan, Table 2-1.

8        54.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin

9    Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water

10   Act, 33 U.S.C. § 1313(d).

11       55.    Polluted discharges from industrial sites, such as the Facility, contribute to the

12   degradation of these already impaired surface waters and aquatic-dependent wildlife. Discharges

13   of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the

14   waters receiving the discharges.  WQS applicable to dischargers covered by the Storm Water

15   Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for

16   Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

17       56.    The Basin Plan sets forth, among other things, narrative WQS for floating material, Oil &

18   Grease, sediment, settleable matter, and suspended materials, and sets forth numeric WQS for

19   pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium, silver,

20   tributyltin, zinc, and hydrocarbons ("PAHs"). *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-

21   3.3.14, 3.3.21, and Table 3-3.

22       57.    The Basin Plan also includes site specific objectives ("SSOs"), which are WQS for

23   specific sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan,

24

Table 3-3A.  The CTR includes numeric criteria set to protect human health and the environment in the State of California.

58.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitations in Section VI.A of the General Permit.

Water Quality Impairment Area

59.     The San Francisco Bay is listed for water quality impairment on the most recent Section 303(d) - list of the General Permit for the following: chlordane; dichlorodiphenyltrichloroethane (DDT); dieldrin; dioxin compounds (including 2,3,7,8- tetrachlorodibenzo-pdioxin); furan compounds; invasive species; mercury; polychlorinated biphenyls (PCBs); PCBs (dioxin-like); selenium, and trash.

Citizen Suit Provision of the CWA

60.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1). No action may be commenced "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the [EPA] Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

61.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any

permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation occurring before November 2, 2015, and $51,570.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

62.    Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

## FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

63.    Defendant CORDEIRO VAULT is part of the industry that is primarily engaged in manufacturing concrete products primarily ground burial vaults from a combination of cement and aggregate material.

64.    EDEN is informed and believes that the Facility falls primarily within the standard industrial classification ("SIC") Code 3272 – Concrete Products, except blocks and bricks. The General Permit requires establishments designated under SIC Code 3272 to test for the following analytical parameters: Iron (Fe). Table 2, of the General Permit.

65.    According to the EPA's Stormwater Discharge Mapping Tools the Facility discharges stormwater into the municipal storm drain system, which then discharges into the Napa River, then into the San Pablo Bay, a tributary of the San Francisco Bay which is the "Receiving Waters" for the Facilities. *See*, EPA's Stormwater Discharge Mapping Tools, *available at https://www.epa.gov/npdes/epas-stormwater-discharge-mapping-tools.*

66.    EDEN is informed and believes that Defendant CORDEIRO VAULT stores industrial materials outdoors and/or on-site including cement and aggregate that can be exposed to storm water, or tracked from spills and leaks that otherwise contaminate the surrounding watershed.

67.     EDEN is informed and believes that based on its investigation, including a review of the Regional Water Board's records and aerial photography storm water is collected and discharged from the Facilities through a series of channels that discharge via at least one outfall.  The outfall discharges storm water and pollutants contained in that storm water that eventually discharges into the San Francisco Bay, a navigable Water of the United States.

68.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facilities where industrial activities occur and areas where airborne materials associated with the industrial processes at the facilities may settle onto the ground.  Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water channels.

69.     On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facilities.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facilities are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

   Defendant's was Late in its Reapplication for the NPDES Permit
   Coverage - (5th Street Facility)

70.     The CWA prohibits storm water discharges without a permit. 33 U.S.C. § 1342; 40 C.F.R. § 122.26.  The General Permit regulates operators of facilities subject to coverage under the National Pollutant Discharge Elimination System ("NPDES") storm water permit, as these operators discharge storm water associated with specific industrial activities identified by both industrial activity and SIC (Standard Industrial Classification) codes in Attachment A of the General Permit.

71.   CORDEIRO VAULT was required to apply for coverage under the General Permit in order to commence business operations, pursuant to Section I.Q of the General Permit. According to California Secretary of State records, CORDEIRO VAULT commenced its operations at the site on or before June 27, 1975.

72.   CORDEIRO VAULT was covered under the 1997 Industrial General Order, which expired on June 30, 2015, and was replaced by the 2014 Industrial General Permit, which became effective on July 1, 2015.  In order to continue regulatory coverage under the new Permit, CORDEIRO VAULT was required to complete a recertification process on or before August 14, 2015.  On information and belief, Plaintiff alleges the Regional Water Board issued two separate Notices of Noncompliance to the Facility, CORDEIRO VAULT for failing to recertify for General Permit coverage and was subsequently terminated from the program, effective August 15, 2015.

73.   On information and belief, Plaintiff alleges CORDEIRO VAULT did not in fact re-apply for coverage until December 23, 2015. Thus, between at least August 15, 2015 and December 23, 2015, CORDEIRO VAULT operated without NDPES Permit coverage.  On information and belief, Plaintiff alleges that during that time, CORDEIRO VAULT did not comply with any of the terms of the Permit, including implementing Best Management Practices, collecting and analyzing storm water runoff for pollution parameters, preparing and implementing a Storm Water Pollution Prevention Plan, or filing Annual Reports.

74.   Permit noncompliance constitutes a violation of the Clean Water Act and the Water Code, is grounds for enforcement action against CORDEIRO VAULT and is further a violation of Sections XXI.A of the General Permit.

Deficient SWPPP and Site Map – (Both Facility)

75.     On information and belief, Plaintiff alleges that since at least the beginning of the Facility's operations, Defendant CORDEIRO VAULT has failed to develop an adequate SWPPP and a Site Map for the Facility as detailed in Plaintiff's 60-Day Notices attached hereto as Exhibit A (Ryder Street Facility) and Exhibit A-1 (5th Street Facility), incorporated herein by reference. Exhibits A and A-1, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").

76.     On information and belief, EDEN alleges that the Facilities have failed to upload an adequate revised SWPPP pursuant to Section X *et seq.* of the General Permit.

Monitoring and Reporting – Monthly Visual Observations – (Both Facilities)

77.     On information and belief, EDEN alleges Defendant CORDEIRO VAULT does not have an adequate storm water monitoring program at its Facility since at least the beginning of the Facility's operations, as required by Section XI.A of the General Permit.

78.     On information and belief, EDEN alleges that Defendant has failed to conduct monthly visual observations of storm water discharges at the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

79.     Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances, TSS, O&G, and Iron are being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Collect and Analyze the Required Number of Storm Water Samples

80.     The Defendant CORDEIRO VAULT required to collect and analyze two storm water samples from the first half of the reporting year (July 1 to December 31) and two storm water

samples for the second half of the reporting year (January 1 to June 30), pursuant to Sections XI.B2 and XI.B11.a of the General Permit.

81.    On information and belief, Eden alleges that Defendant CORDEIRO VAULT failed to collect and analyze the required number of storm water samples at the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

Missing Storm Water Samples – (Ryder Street Facility)

82.    On information and belief, EDEN alleges that during the 2015-2016 reporting year, Defendant did not collect and analyze one stormwater sample for the first half of the reporting year.

83.    On information and belief, EDEN alleges that during the 2017-2018 reporting year, Defendant did not collect and analyze any storm water sample from the first half of the reporting year.

84.    On information and belief, EDEN alleges that during the 2018-2019 reporting year, Defendant did not collect and analyze one storm water sample from the first half of the reporting year and one storm water sample for the second half of the reporting year.

85.    On information and belief, EDEN alleges that during the 2019-2020 reporting year, Defendant failed to collect and analyze one storm water sample from the first half of the reporting year and one sample for the second half of the reporting year.

86.    On information and belief, EDEN alleges that during the 2020-2021 reporting year, Defendant failed to collect and analyze one storm water sample from the first half of the reporting year and failed to collect any samples for the second half of the reporting year.

*(A Chart of the above narration is provided for further reference)*

**Ryder Street Facility**

| Reporting Year | QSE's Sampled in First Half | QSE's Sampled in Second Half | |
|---|---|---|---|
| 2015-16 | 1 | 2 | |
| 2016-17 | 2 | 2 | |
| 2017-18 | 0 | 3 | |
| 2018-19 | 1 | 1 | |
| 2019-20 | 1 | 1 | |
| 2020-21 | 1 | 0 | |
| 2021-22 | 2 | n/a | |
| Total Sampled | 8 | 9 | |
| QSE's Required | 14 | 12 | |
| **QSE's Missing** | **6** | **3** | **14 Total** |

Missing Storm Water Samples - (5th Street Facility)

87.    On information and belief, EDEN alleges that during the 2015-2016 reporting year, Defendant did not collect and analyze one stormwater sample for the first half of the reporting year.

88.    On information and belief, EDEN alleges that during the 2016-2017 reporting year, Defendant did not collect and analyze one stormwater sample for the second half of the reporting year.

89.    On information and belief, EDEN alleges that during the 2017-2018 reporting year, Defendant did not collect and analyze one stormwater sample for the second half of the reporting year.

90.    On information and belief, EDEN alleges that during the 2018-2019 reporting year, Defendant did not collect and analyze one stormwater sample for the first half of the reporting year and failed to collect one sample for the second half of the reporting year.

91.     On information and belief, EDEN alleges that during the 2019-2020 reporting year, Defendant did not collect and analyze one stormwater sample for the first half of the reporting year and failed to collect one storm water sample for the second half of the reporting year.

92.     On information and belief, EDEN alleges that during the 2020-2021 reporting year, Defendant did not collect and analyze one stormwater sample for the first half of the reporting year.

93.     On information and belief, EDEN alleges that during the 2021-2022 reporting year, Defendant did not collect and analyze any stormwater sample for the first half of the reporting year.

*(A Chart of the above narration is provided for further reference)*

94.     **5th  Street Facility**

| Reporting Year | QSE's Sampled in First Half | QSE's Sampled in Second Half | |
|---|---|---|---|
| 2015-16 | 1 | 2 | |
| 2016-17 | 2 | 1 | |
| 2017-18 | 2 | 1 | |
| 2018-19 | 1 | 1 | |
| 2019-20 | 1 | 1 | |
| 2020-21 | 1 | 2 | |
| 2021-22 | 0 | n/a | |
| Total Sampled | 8 | 8 | |
| QSE's Required | 14 | 12 | |
| **QSE's Missing** | **6** | **4** | **10 Total** |

95.     Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances, TSS, O&G, and Iron are being discharged during rain events from the Facility to the San Francisco Bay.

1

Failure to Collect Storm Water Samples During Qualified Storm Events

2

96.    On information and belief, EDEN alleges that Defendant CORDEIRO VAULT has taken

3

samples of storm water discharges at its Facilities that failed to comply with the General Permit's

4

requirement that storm water samples be preceded by a 48-hour period without a discharge,

5

pursuant to Section XI.B of the General Permit.

6

Ryder Street Facility

7

97.    On information and belief, EDEN alleges that Defendant's samples collected from the

8

Ryder Street Facility, as listed in the chart below, were not in compliance with the General

9

Permit because they were not collected during Qualified Storm Events as defined in the General

10

Permit.

11

12

| Sample Date | QSE Info |
|---|---|
| 12/24/2015 | Not a valid QSE – not preceded by 48 hours of no discharge |
| 12/15/2016 | Not a valid QSE – 2nd consecutive day of rainfall |
| 01/10/2017 | Not a valid QSE – 4th consecutive day of rainfall |
| 03/02/2018 | Not a valid QSE – 3rd consecutive day of rainfall |
| 04/16/2018 | Not a valid QSE – 2nd consecutive day of rainfall |
| 11/29/2018 | Not a valid QSE – 3rd consecutive day of rainfall |

13

14

15

16

5th Street Facility

17

98.    On information and belief, EDEN alleges that Defendant's samples collected from the

18

5th Street Facility, as listed in the chart below, were not in compliance with the General Permit

19

because they were not collected during Qualified Storm Events as defined in the General Permit.

20

21

| Sample Date | QSE Info |
|---|---|
| 12/24/2015 | Not a valid QSE – not preceded by 48 hours of no discharge |
| 12/15/2016 | Not a valid QSE – 2nd consecutive day of rainfall |
| 01/10/2017 | Not a valid QSE – 4th consecutive day of rainfall |
| 04/07/2017 | Not a valid QSE – 2nd consecutive day of rainfall |
| 03/02/2018 | Not a valid QSE – 3rd consecutive day of rainfall |

22

23

24

| 04/16/2018 | Not a valid QSE – 2nd consecutive day of rainfall |
| 11/29/2018 | Not a valid QSE – 3rd consecutive day of rainfall |
| 01/16/2019 | Not a valid QSE – 2nd consecutive day of rainfall |
| 12/02/2019 | Not a valid QSE – 3rd consecutive day of rainfall |
| 12/17/2020 | Not a valid QSE – 2nd consecutive day of rainfall |
| 10/25/2021 | Not a valid QSE – 5th consecutive day of rainfall |
| 11/09/2021 | Not a valid QSE – 2nd consecutive day of rainfall |

99.     Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances, TSS, and Iron are being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Deliver Samples to a Laboratory Within 48 Hours of
Collection – (Ryder Street Facility)

100.     Pursuant to Attachment H, Section 2 of the General Permit, Discharges are required to deliver stormwater run-off samples to a qualified Laboratory within 48 hours of the date and time of physical sampling.

101.     On information and belief, EDEN alleges Defendant failed to include an example in its SWPPP of a Chain of Custody form as required by the General Permit, Section X.I.5 and Attachment H, no. 14.

102.     On information and belief, EDEN alleges Defendant did not have all its laboratory analyses conducted according to approved testing procedures, including, but not limited to proper storage and temperature requirements for storm water samples, to ensure accurate results, a violation of General Permit, Attachment H, no. 18, citing 40 C.F.R. § 136.

103.     On information and belief, EDEN alleges the relinquished and received dates of samples collected from the Ryder Street Facility are unknown and unable to be determined because Defendant failed to upload any of the required Chain of Custody forms as required by the General Permit.

104.    On information and belief, EDEN alleges Defendant's failure to upload the Chain of Custody forms is evidence Defendant did not deliver the samples to a Laboratory within 48 hours of collection.

105.    On information and belief, EDEN alleges Defendant's failure to upload the Chain of Custody form is evidence Defendant did not have all its laboratory analyses conducted according to approved testing procedures, including, but not limited to proper storage and temperature requirements for samples to ensure accurate results.

106.    Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances, TSS, O&G, and Iron are being discharged during rain events from the Facility to the San Francisco Bay.

    Failure to Upload Stormwater Sample Analyses Within 30 Days – (Both Facilities)

107.    Defendant CORDEIRO VAULT required to submit sampling and analytical test results for all stormwater sampling by uploading the data into the SMARTS system within thirty (30) days, pursuant to Section XI.B.11 of the General Permit.

108.    On information and belief, EDEN alleges that Defendant failed to upload into SMARTS all of its storm water sampling and analytical results within thirty (30) days, a violation of the General Permit, as demonstrated in the following charts.

**Ryder Street Facility**

| Sample Date | Date of Laboratory Report | Date Uploaded into SMARTS | Number of Days Late |
|---|---|---|---|
| 12/24/2015 | 01/07/2016 | 06/20/2016 | 135 |
| 01/13/2016 | 01/26/2016 | 06/20/2016 | 116 |
| 03/04/2016 | 03/14/2016 | 06/20/2016 | 68 |
| 01/10/2017 | 01/30/2017 | 03/21/2017 | 20 |
| 04/07/2017 | 04/21/2017 | 07/12/2017 | 52 |

| 01/08/2018 | 01/19/2018 | 06/05/2018 | 107 |
| 03/02/2018 | 03/15/2018 | 06/05/2018 | 52 |
| 04/16/2018 | 05/03/2018 | 07/12/2018 | 40 |
| 11/29/2018 | 12/15/2018 | 07/15/2019 | 182 |
| 01/16/2019 | 02/06/2019 | 07/15/2019 | 129 |
| 12/02/2019 | 12/13/2019 | 06/30/2020 | 170 |
| 03/04/2020 | 04/09/2020 | 07/08/2020 | 60 |
| 12/17/2020 | 12/28/2020 | 06/23/2021 | 147 |
| 10/25/2021 | 11/08/2021 | 03/23/2022 | 105 |
| 11/09/2021 | 11/22/2021 | 03/23/2022 | 91 |

**5th Street Facility**

| Sample Date | Date of Laboratory Report | Date Uploaded into SMARTS | Number of Days Late |
|---|---|---|---|
| 12/24/2015 | 01/07/2016 | 06/16/2016 | 131 |
| 01/13/2016 | 01/26/2016 | 06/16/2016 | 112 |
| 03/04/2016 | 03/14/2016 | 06/16/2016 | 64 |
| 10/14/2016 | 10/28/2016 | 12/31/2016 | 34 |
| 12/15/2016 | 01/05/2017 | 03/21/2017 | 45 |
| 01/10/2017 | 01/30/2017 | 03/21/2017 | 20 |
| 04/07/2017 | 04/21/2017 | 07/12/2017 | 52 |
| 01/08/2018 | 01/19/2018 | 06/05/2018 | 107 |
| 03/02/2018 | 03/15/2018 | 07/12/2018 | 89 |
| 04/16/2018 | 05/03/2018 | 07/12/2018 | 40 |
| 11/29/2018 | 12/18/2018 | 07/15/2019 | 179 |
| 01/16/2019 | 02/06/2019 | 07/15/2019 | 129 |
| 12/02/2019 | 12/13/2019 | 07/09/2020 | 179 |
| 03/24/2020 | 04/09/2020 | 07/10/2020 | 62 |
| 12/17/2020 | 12/28/2020 | 06/23/2021 | 147 |
| 10/25/2021 | 11/08/2021 | 03/23/2022 | 105 |
| 11/09/2021 | 11/22/2021 | 03/23/2022 | 91 |

Failure to Analyze Stormwater Samples for the Parameter of Iron – (Ryder Street Facility)

109.     Section XI.B.6.d of the General Permit requires "Additional Analytical Parameters" listed in Table 1 of the General Permit, which are related to the facility's Standard Industrial Classification (SIC) code(s).

110.    On information and belief, EDEN alleges Ryder Street Facility's SIC Code is 3272-Concrete Products, which requires Defendant to include Iron (Fe) as an additional sampling parameter.

111.    On information and belief, EDEN alleges that all of Defendant's laboratory reports failed to analyze for the required parameter of Iron, a violation of the General Permit.

112.    Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, Iron affected substances, are being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Analyze Stormwater Samples for the Parameter of TPH Diesel and TPH Gasoline – (Ryder Street Facility)

113.    Section XI.B.6.c of the General Permit requires Dischargers to analyze for any additional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment contained in the Facility's SWPPP.

114.    On information and belief, EDEN alleges the Ryder Street Facility's SWPPP does not contain a Pollutant Source Assessment.

115.    On information and belief, EDEN alleges the Ryder Street Facility's Site Map does, however, indicate there is an Underground Storage Tanks ("UST") containing 1,000 gallons of Diesel Fluid and 500 gallons of Gasoline.

116.    On information and belief, EDEN alleges that because the Ryder Street Facility contains USTs for diesel and gasoline, Defendant is required to include the additional sampling and analytical parameters of THP- Diesel and THP-Gasoline since they are potential pollution sources.

117.     On information and belief, EDEN alleges that all of Defendant's laboratory reports failed to analyze for the required parameter of THP-Diesel and THP-Gasoline, a violation of the General Permit, Attachment A, Transportation Facilities.

118.     Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, Iron, TPH-Diesel and TPH-Gasoline affected substances, are being discharged during rain events from the Facility to the San Francisco Bay.

Discharges of Contaminated Storm Water – (Both Facilities)

119.     Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges in violation of the General Permit.

120.     Due to the nature of the operations at the Facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendant is discharging storm water containing excessive levels of pollutants specific to their operation during at least every significant local rain event.  These pollutants include storm water contaminated with, but not limited to, pH affected substances, oil & grease, total suspended solids, and Iron.

Discharges of Contaminated Storm Water - Ryder Street Facility

121.     For the Reporting Year 2017-2018 the **Oil and Grease** level detected at the Facility on 1/8/2018 was measured at 0.33 mg/L which exceeded of the Instantaneous Maximum NAL of 0.25 mg/L established by the General Permit.

122.     For the Reporting Year 2017-2018 the **pH** level detected at the Facility on 3/2/2018 was measured at 2.0 standard units which exceeded both the Instantaneous Maximum NAL of less

than 6.0 and greater than 9.0 and the Bain Plan's Effluent Limitations and Water Quality Objectives of less than 6.5 and greater than 8.5 units.[1]

123.    For the Reporting Year 2020-2021 **total suspended solids** level detected at the Facility on 12/17/2020 was measured at, on average, 162.67 mg/L, which exceeded the Annual NAL for TSS of 100 mg/L established by the General Permit.

<u>Discharges of Contaminated Storm Water - 5th Street Facility</u>

124.    For the Reporting Year 2015-2016 the **total suspended solids** level detected at the Facility on 3/4/2016 was measured at 412 mg/L which exceeded both the Annual NAL for total suspend solids of 100 mg/L and the Instantaneous Maximum NAL of 400 mg/L.

125.    For the Reporting Year 2017-2018, the **Oil & Grease** level detected at the Facility on 1/8/2018 was measured at, on average, 0.15.13 mg/L which exceeded both the Annual NAL of 0.15 mg/L and was measured at an instantaneous level of 0.33 mg/L which exceeded the Instantaneous Maximum NAL for total suspended solids of 0.25 mg/L.

126.    For the Reporting Year 2017-2018 the **pH** level detected at the Facility on 3/2/2018 was measured at 2.0 standard units which exceeded both the Instantaneous Maximum NAL of less than 6.0 and greater than 9.0 and the Bain Plan's Effluent Limitations and Water Quality Objectives of less than 6.5 and greater than 8.5 units.[2]

127.    For the Reporting Year 2019-2020, the **Oil & Grease** level detected at the Facility on 3/24/20 was measured at 0.35 mg/L which exceeded both the Annual NAL of 0.15 mg/L and the Instantaneous Maximum NAL for oil and grease of 0.25 mg/L.

---

[1] S. F. Bay Regional Water Quality Control Board, Bain Plan, Table 3-5, *Water Quality Objectives for Municipal Supply* and California Regional Water Quality Control Board – San Francisco Bay Region, Order No. R2-2018-0050, Table 2, *Effluent Limitations*.
[2] *Ibid*.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION
Page 28

128.    For the Reporting Year 2019-2020, the **Oil & Grease** level detected at the Facility was measured at, on average, 0.21.35 mg/L which exceeded the Annual NAL for total oil and grease of 0.15 mg/L.

Failure to Conduct an Evaluation and to Submit a Level 1 ERA Report
for Oil and Grease – (Ryder Street Facility)

129.    On information and belief, Plaintiff alleges that the Facility exceeded the General Permit's NAL for Oil and Grease for the reporting year 2017-2018 which caused Defendant to enter Level 1 status on July 1, 2018, in violation of Section XII *et seq*. of the General Permit.

130.    On information and belief, EDEN alleges that Defendant was required to have a Qualified Industrial Storm Water Practitioner ("QISP") conduct an Evaluation of the Facility by October 1, 2018, and to upload an adequate Level 1 ERA Report for Oil and Grease on or before January 1, 2019.

131.    On information and belief, EDEN alleges that the Facility has failed to conduct an evaluation and submit a Level 1 ERA Report for Oil and Grease by uploading it to SMARTS on or before January 1, 2019.

132.    Everyday Defendant conducts operations at the Facility without conducting an adequate Level 1 status Evaluation and without submitting an adequate Level 1 ERA Report is a separate and distinct violation of the General Permit.

Failure to Conduct an Evaluation and to Submit a Level 1 ERA Report
for pH – (Ryder Street Facility)

133.    On information and belief, Plaintiff alleges that the Facility exceeded the General Permit's NAL for pH for the reporting year 2017-2018 which caused Defendant to enter Level 1 status on July 1, 2018, in violation of Section XII *et seq*. of the General Permit.

134.     On information and belief, EDEN alleges that Defendant was required to have a Qualified Industrial Storm Water Practitioner ("QISP") conduct an Evaluation of the Facility by October 1, 2018, and to upload an adequate Level 1 ERA Report for pH on or before January 1, 2019.

135.     On information and belief, EDEN alleges that the Facility has failed to conduct an evaluation and submit a Level 1 ERA Report for pH by uploading it to SMARTS on or before January 1, 2019.

136.     Everyday Defendant conducts operations at the Facility without conducting an adequate Level 1 status Evaluation and without submitting an adequate Level 1 ERA Report is a separate and distinct violation of the General Permit.

Failure to Conduct an Evaluation and to Submit a Level 1 ERA Report
for TSS – (Ryder Street Facility)

137.     On information and belief, Plaintiff alleges that the Facility exceeded the General Permit's NAL for TSS for the reporting year 2020-2021 which caused Defendant to enter Level 1 status on July 1, 2021, in violation of Section XII *et seq.* of the General Permit.

138.     On information and belief, EDEN alleges that Defendant was required to have a Qualified Industrial Storm Water Practitioner ("QISP") conduct an Evaluation of the Facility by October 1, 2021, and to upload an adequate Level 1 ERA Report for TSS on or before January 1, 2022.

139.     On information and belief, EDEN alleges that the Facility has failed to conduct an evaluation and submit a Level 1 ERA Report for TSS by uploading it to SMARTS on or before January 1, 2022.

140.    Everyday Defendant conducts operations at the Facility without conducting an adequate Level 1 status Evaluation and without submitting an adequate Level 1 ERA Report is a separate and distinct violation of the General Permit.

Failure to Conduct an Evaluation and to Submit a Level 1 ERA Report
for TSS – (5th Street Facility)

141.    On information and belief, Plaintiff alleges that the Facility exceeded the General Permit's NAL for TSS for the reporting year 2015-2016 which caused Defendant to enter Level 1 status on July 1, 2016, in violation of Section XII *et seq.* of the General Permit.

142.    On information and belief, EDEN alleges that Defendant was required to have a Qualified Industrial Storm Water Practitioner ("QISP") conduct an Evaluation of the Facility by October 1, 2016, and to upload an adequate Level 1 ERA Report for TSS on or before January 1, 2022.

143.    On information and belief, EDEN alleges that the Facility's Level 1 Report for TSS does not include the Instantaneous Maximum NAL exceedance of 412.0 mg/L for TSS that occurred on 3/4/2015, a violation of the General Permit, Section XII.C.1.b, "complete evaluation."

144.    On information and belief, EDEN alleges Defendant Level 1 Report for TSS is inadequate because it did not do a complete evaluation of all discharges of TSS, a violation of the General Permit,

145.    Everyday Defendant conducts operations at the Facility without conducting an adequate Level 1 status Evaluation and without submitting an adequate Level 1 ERA Report is a separate and distinct violation of the General Permit, Section XII.C.1.b, "complete evaluation."

Failure to Conduct an Evaluation and to Submit a Level 1 ERA Report
for pH and Oil & Grease – (5th Street Facility)

146.     On information and belief, Plaintiff alleges that the Facility exceeded the General Permit's NAL for pH and Oil & Grease for the reporting year 2017-2018 which caused Defendant to enter Level 1 status on July 1, 2018, in violation of Section XII *et seq.* of the General Permit.

147.     On information and belief, EDEN alleges that Defendant was required to have a Qualified Industrial Storm Water Practitioner ("QISP") conduct an Evaluation of the Facility by October 1, 2018, and to upload an adequate Level 1 ERA Report for pH and Oil & Grease on or before January 1, 2019.

148.     On information and belief, EDEN alleges that the Facility has failed to conduct an Evaluation and submit a Level 1 ERA Report for pH and Oil & Grease by uploading it to SMARTS on or before January 1, 2019.

149.     Everyday Defendant conducts operations at the Facility without conducting an adequate Level 1 status Evaluation and without submitting an adequate Level 1 ERA Report is a separate and distinct violation of the General Permit.

Failure to Submit Level 2 ERA *Action Plan* for Oil & Grease – (5th Street Facility)

150.     On information and belief, EDEN alleges that Defendant, while in Level 1 status for exceeding the Annual NAL for Oil & Grease during the reporting year 2018-19; the Facility again exceeded the Annual NAL for Oil & Grease for the Reporting Year 2019-2020, which resulted in elevating Defendant to Level 2 status on July 1, 2020, in violation of Section XII *et seq.* of the General Permit.

151.    On information and belief, EDEN alleges that Defendant was required to have a QISP certify and upload to SMARTS a Level 2 Action Plan that addresses each new Level 2 Annual NAL exceedance at the Facility.

152.    On information and belief, EDEN alleges that after Defendant enter Level 2 status for Oil & Grease, Defendant failed to upload to SMARTS a Level 2 Action Plan on or before January 1, 2021.

153.    Everyday Defendant conducts operations at the Facility without preparing a Level 2 Action Plan for Oil & Grease is a separate and distinct violation of the General Permit.

<u>Failure to Submit Level 2 ERA *Technical Report* for Oil & Grease – (5th Street Facility)</u>

154.    On information and belief, EDEN alleges that Defendant, while on Level 1 status for exceeding the Annual NAL for Oil & Grease during the reporting year 2018-2019; the Facility again exceeded the Annual NAL for Oil & Grease for the Reporting Year 2019-2020, which resulted in elevating Defendant to Level 2 status on July 1, 2020, in violation of Section XII *et seq.* of the General Permit.

155.    On information and belief, EDEN alleges that Defendant was required to have a QISP certify and upload to SMARTS a Level 2 Technical Report that addresses each new Level 2 Annual NAL exceedance at the Facility.

156.    On information and belief, EDEN alleges that after Defendant enter Level 2 status for Oil & Grease, Defendant failed to upload to SMARTS a Level 2 Technical Report on or before January 1, 2021.

157.    Everyday Defendant conducts operations at the Facility without preparing a Level 2 Technical Report for Oil & Grease is a separate and distinct violation of the General Permit.

1

2

<u>Deficient Implementation of BAT/BCT and Minimum Best Management
Practices (BMPs) – (Both Facilities)</u>

3

158.     EDEN is informed and believes that Defendant CORDEIRO VAULT has failed, since at

4

least the beginning of the Facility's operations, to identify and implement Best Management

5

Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for

6

best conventional treatment (BCT) for conventional pollutants, and best available technology

7

(BAT) for toxic and non-conventional pollutants. General Permit, Sections I.C, V.A.

8

159.     EDEN is informed and believes that Defendant has failed, since at least the beginning of

9

the Facility's operations, to identify and implement Minimum BMPs including, but not limited

10

to, measures for checking for spills and leaks; procedures to prevent material tracking,

11

implementing adequate clean-up methods for industrial materials; and protocols preventing the

12

disposal of industrial materials into the stormwater conveyance system.  General Permit, Section,

X.H.1.a.i-ix.

13

160.     Information available to EDEN indicates that as a result of these practices, stormwater

14

containing excessive pollutants, including, but not limited to, pH affected substances, TSS,

15

O&G, Iron, THP-Diesel and THP-Gasoline are being discharged during rain events from the

16

Facility to the San Francisco Bay.

17

<u>Deficient Implementation of BAT/BCT and Minimum Best Management
Practices (BMPs) – (Ryder Street Facility)</u>

18

19

161.     EDEN is informed and believes that Defendant CORDEIRO VAULT has failed, since at

20

least the beginning of the Facility's operations, to identify and implement Best Management

21

Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for

22

best conventional treatment (BCT) for conventional pollutants, and best available technology

23

(BAT) for toxic and non-conventional pollutants. General Permit, Sections I.C, V.A.

24

162.     EDEN is informed and believes that Defendant has failed, since at least the beginning of the Facility's operations, to identify and implement Minimum BMPs including, but not limited to, measures for checking for spills and leaks; procedures to prevent material tracking, implementing adequate clean-up methods for industrial materials; and protocols preventing the disposal of industrial materials into the stormwater conveyance system.  General Permit, Section, X.H.1.a.i-ix.

163.     On information and belief, EDEN alleges Defendant's has on site an underground storage tank containing about 1,000 gallons of diesel fuel and an underground storage tank containing about 500 gallons of gasoline.

164.     On information and belief, EDEN alleges Defendant regularly has diesel fuel and gasoline transferred from trucks into the underground storage tank located on its Facility.

165.     On information and belief, Eden alleges that during Defendant's fueling operations spills and/or leaks of diesel fuel and/or gasoline occur at the Facility which are then subject to stormwater exposure and/or tracking that conveys these pollutants into the San Francisco Bay. General Permit, Attachment A, Transportation Facilities, no. 8.

166.     Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances, TSS, O&G, Iron, THP-Diesel, and THP-Gasoline are being discharged during rain events from the Facility to the San Francisco Bay.

### Failure to Update and Amend the SWPPP – (Both Facilities)

167.     On information and belief, EDEN alleges Defendant failed to upload an adequate SWPPP to SMARTS pursuant to the mandates of the Regional Water Quality Control Board and the General Permit.

168.    On information and belief, EDEN alleges Defendant entered into Level 1 status and Level 2 status and both of these categories require there be BMP revisions to update and/or amend the SWPPP.

169.    On information and belief, EDEN alleges Defendant has failed to upload an amended and updated SWPPP a violation of Sections X.B and XII.C.2.a of the General Permit.

Falsification of Annual Reports – (Both Facilities)

170.    EDEN is informed and believes that Defendant has submitted falsified Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI.L and XXI.N of the General Permit.

171.    Section XI.B of the General Permit provides that the Facility must collect and analyze two storm water samples in the first half of each reporting year (July 1 to December 31), and two samples in the second half of each reporting year (January 1 to June 30).

Ryder Street Facility

172.    On June 27, 2016, July 13, 2017, July 15, 2018, July 15, 2019, and July 10, 2020 Defendant submitted its Annual Reports regarding the Ryder Street Facility for the Fiscal Years 2015-16 through 2019-2020. Mr. Daniel Cordeiro signed those Annual Reports under penalty of perjury as the Legally Responsible Person ("LRP").

173.    Mr. Daniel Cordeiro responded "Yes" to Question No. 3 on their Annual Reports ("Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?")

174.    On information and belief, EDEN alleges Defendant's LRP has failed to collect and analyze all the required storm water samples during reporting years in question.

175.     If a Facility does not collect four storm water samples during a particular reporting year, the reporting requirements of the General Permit require the Facility to indicate "NO" to Question NO. 3 on the Facility Annual Report and to provide an explanation for why the required number of samples were not collected. The explanation as to why there were insufficient QSEs is to be provided in Attachment 1 to the Annual Report.

176.     Records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years 2015 through 2022, there were sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Defendant to collect the requisite number of samples. Further, there were other Facilities near the Defendant's Facility that were able to collect the required number of storm water samples during the Reporting Years.

177.     Based on the foregoing, it is clear that Defendant's LRP intentionally made false statements in the Facility's Annual Reports when he indicated that the Facility had collected samples according to Section XI.B of the General Permit during the reporting years when in fact the Facility did not collect the required number of samples, which is a violation of the General Permit.

### 5th Street Facility

178.     On June 27, 2016, July 13, 2017, July 15, 2018, July 15, 2019, and July 30, 2020 Defendant submitted its Annual Reports regarding the 5th Street Facility for the Fiscal Years 2015-16 through 2019-2020. Mr. Daniel Cordeiro signed those Annual Reports under penalty of perjury as the Legally Responsible Person ("LRP").

179. Mr. Daniel Cordeiro responded "Yes" to Question No. 3 on their Annual Reports ("Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?")

180. On information and belief, EDEN alleges Defendant's LRP has failed to collect and analyze all the required storm water samples during reporting years in question.

181. If a Facility does not collect four storm water samples during a particular reporting year, the reporting requirements of the General Permit require the Facility to indicate "NO" to Question NO. 3 on the Facility Annual Report and to provide an explanation for why the required number of samples were not collected. The explanation as to why there were insufficient QSEs is to be provided in Attachment 1 to the Annual Report.

182. Records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years 2015 through 2022, there were sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Defendant to collect the requisite number of samples. Further, there were other Facilities near the Defendant's Facility that were able to collect the required number of storm water samples during the Reporting Years.

183. Based on the foregoing, it is clear that Defendant's LRP intentionally made false statements in the Facility's Annual Reports when he indicated that the Facility had collected samples according to Section XI.B of the General Permit during the reporting years when in fact the Facility did not collect the required number of samples, which is a violation of the General Permit.

<u>Failure to Comply with the Mandates of the Regional Water
Board – (Ryder Street Facility)</u>

184.     Pursuant to Section XIX of the General Permit, Regional Water Boards have general authority to enforce the provisions and requirements of the General Permit, including reviewing SWPPPs, Monitoring Implementation Plans, ERA Reports, and Annual Reports and requiring Dischargers to revise and re-submit Permit Registration Documents, conducting compliance inspections, and taking enforcement actions.

185.     The Regional Water Quality Control Board issued Defendant a Notice of Violation on October 21, 2021, for Failure to Submit Industrial Stormwater Exceedance Response Action Reports, requiring the Facility to submit the Late Level 1 ERA reports immediately.

186.     Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances, TSS, O&G, Iron, THP-Diesel, and THP-Gasoline are being discharged during rain events from the Facility to the San Francisco Bay, a violation of the General Permit.

<u>Failure to File Timely Annual Reports – (5th Street Facility)</u>

187.     EDEN is informed and believes that Defendant have failed to comply with Section XVI.A of the General Permit, which provides that Dischargers shall certify and submit by way of SMARTS an Annual Report no later than July 15th following each reporting year.

188.     The Annual Report shall include a Compliance Checklist that indicates whether the Discharger has addressed all the General Permit requirements; an explanation for any non-compliance with the General Permit requirements, and an identification of all revisions made to the SWPPP within the reporting year.

189.    On information and belief, Eden alleges that Defendant failed to timely file their Annual Report for the reporting years 2014 - 2015, by late filing it on December 23, 2015, in violation of the General Permit.

Failure to Train Employees – (Both Facilities)

190.    Sections X.D.1 and X.H.f of the General Permit requires all Facilities to designate a Legally Responsible Person to implement the requirements of the Permit, who is then responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

191.    Defendant's failure to train its employees and designate a Pollution Prevention Team is evidenced by the Facility's failure to develop and implement a satisfactory SWPPP or adequate BMPs at the Facility, failure to conduct monthly visual observations, and failure to fully comply with required storm water sampling and analysis procedures.

192.    On information and belief, Eden alleges that Defendant failed to appoint a Pollution Prevention Team and/or adequate train its pollution prevention team for the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

193.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, pH affected substances, TSS, O&G, Iron, THP-Diesel, and THP-Gasoline are being discharged during rain events from the Facility to the San Francisco Bay.

194.    Information available to Plaintiff indicates that Defendant has not fulfilled the

requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

**FIRST CAUSE OF ACTION**
**Failure to Develop a Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

195.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

196.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement a SWPPP and create a compliant Site Map.

197.     As outlined herein, Defendant have failed to develop and implement an adequate SWPPP or Site Map for the Facility.

198.     Each day since at least the beginning of the Facility's operations, that Defendant failed to develop an adequate SWPPP and Site Map for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendant.

**SECOND CAUSE OF ACTION**
**Failure to Develop a Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

199.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

200.     The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

201.     As outlined herein, Defendant has failed to develop and implement a monitoring and reporting program for its Facility.

202.     Defendant's ongoing failure to develop and implement a monitoring and reporting program are evidenced by its failure to collect storm water samples pursuant to the requirements of the General Permit.

203.     Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop and implement a monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant. The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

### THIRD CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

204.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

205.     The General Permit's SWPPP requirements and Effluent Limitation Section V.A of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

206.     Defendant has failed to implement BAT and BCT at the Facility for pollutants of pH affected substances, Total Suspended Solids ("TSS") and Oil & Grease and other potentially un-monitored pollutants, in violation of Effluent Limitation Section V.A of the General Permit.

207.     Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a

separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant.

## FOURTH CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

208.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

209.     Discharge Prohibition Section III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Section VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

210.     Plaintiff is informed and believes, and thereupon alleges, that since at least the beginning of the Facility's operations, Defendant has been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D of the General Permit.

211.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with, but not limited to, pH affected substances, TSS, O&G, Iron, THP-Diesel, THP-Gasoline and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated into San Francisco Bay.

212.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

213.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

214.     Every day since at least the beginning of Facility's operations, that Defendant has discharged and continues to discharge polluted stormwater from its Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant.  These violations are ongoing and continuous.

## FIFTH CAUSE OF ACTION
### Failure to Properly Train Facility Employees and Pollution Prevention Team
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

215.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

216.     Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team who is then responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

217.     Section X.H.f of the General Permit also requires that each facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the

General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

218.     Since at least the beginning of Facility's operations, Defendant has failed to properly train Facility employees and the designated members of its Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.

**SIXTH CAUSE OF ACTION**
**False Certification of Compliance in Annual Report**
**(Violations of Permit Conditions and the ACT, 33 U.S.C. §§ 13311, 1342)**

219.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

220.   Plaintiff is informed and believes, and thereon alleges that Defendant has falsely certified compliance with the General Permit in each of its Annual Reports submitted to the Regional Water Board for the reporting years 2015-16 to the present reporting year.

221.    Section XI.B.2 of the General Permit requires that all Facilities collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

222.   Section XI.C.6.b of the General Permit provides that if samples are not collected pursuant to the General Permit, an explanation must be included in the Annual Report.

223.   Plaintiff is informed and believes, and thereon alleges that Defendant violated the General Permit by falsely answering "Yes" to question number three (3) in the Annual Reports and certifying that Defendant had collected and analyzed the required number of storm water samples during the reporting year(s) at issue.

224.    Section XI.B.5 of the General Permit requires that all of the Facility's storm water samples be collected within four (4) hours of the start of a discharge or at the start of the Facility's operations for QSEs occurring within the previous 12-hour period.

225.    Plaintiff is informed and believes, and thereon alleges that Defendant violated the General Permit by falsely answering "Yes" question number nine (9) of the Annual Reports and certifying that Defendant's storm water samples were collected within the time periods of Section XI.B.5 of the General Permit.

226.    Each day since at least the beginning of the Facility's operations that Defendant has falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant.

## SEVENTH CAUSE OF ACTION
### Recovery Under the Catalyst Theory CCP §1021.5

227.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

228.    Under the substantive law of California, if a plaintiff is a catalyst in encouraging a Defendant to voluntarily comply with its legal obligations, the plaintiff may recover its fees and costs. *Graham v. DaimlerChrysler Corp*., 101 P.3d 140, 21 Cal. Rptr. 3d 331, 34 Cal. 4th 553 (2004), *Tipton-Wittingham v. City of Los Angeles* (Cal. Dec. 2, 2004), 34 Cal.4th 604, 21 Cal.Rptr.3d 371, 101 P.3d. 174, 2004 Cal. LEXIS 11335.

229.    A requirement for recovery under the catalyst theory is that a plaintiff first advise the Defendant of the claim and provide an opportunity to resolve the matter.  The Plaintiff in this case complied by providing both the catalyst and the written notice of the claim to Defendant prior to suit as demonstrated in EDEN's Notice of Intent to Sue attached hereto as Exhibit A (Ryder Street Facility) and Exhibit A-1 (5th Street Facility), and incorporated herein by

reference. Exhibit A, 60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").

230.    In the event Defendant allege the claims are moot or are non-justiciable, then Plaintiff must be awarded its fees and costs under California Code of Civil Procedure Section 1021.5 ("Catalyst Theory").

231.    Since the substantive law of California governs awards of Catalyst Theory fees (as opposed to Federal law), Plaintiff requests the Court exercise supplemental jurisdiction over any award of Catalyst Theory fees.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendant to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendant to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.    Enjoin Defendant from discharging pollutants from Defendant's Facility to the surface waters surrounding the Facility until such time as Defendant has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.    Order Defendant to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.    Order Defendant to take appropriate actions to restore the quality of United States waters impaired by its activities at Defendant's Facility;

6.      Order Defendant to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.      Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendant was the catalyst for Defendant's voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendant undertook any such corrective action after receiving Plaintiff's Notice, and;

8.      Award such other and further relief as may be just and proper.


Dated:  September 13, 2022            Respectfully,


By: */s/ Craig A. Brandt*_____
        Craig A. Brandt
        Attorney for Plaintiff