

# EDEN

*Eden Environmental Citizen's Group*

July 1, 2022

<u>Via US Mail, Certified</u>

Attn: Facility Manager
Cordeiro Vault Co, Inc
495 Ryder Street
Vallejo, CA 94590

Gloria Marie Cordeiro
Title: CEO
1543 Silver Trail
Napa, CA 94558

Dan Robert Cordeiro
Agent for service
Cordeiro Vault Co, Inc
1431 Valle Vista
Vallejo, CA 94590

**Re:    60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Cordeiro Vault Co, Inc:

      This letter is being sent to you on behalf of Eden Environmental Citizen's Group, LLC ("EDEN") to give legal notice that EDEN intends to file a civil action against Cordeiro Vault Co, Inc ("Discharger") and its corporate officers and other legally responsible parties for violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the Cordeiro Vault Co, Inc facility located at 495 Ryder Street in Vallejo, California ("the Facility" or "the site").

      EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, wetlands,

---

730 2ⁿᵈ Street #3135
Telephone:  707-241-3529
Website:



Santa Rosa, CA 95402
Email: *edenvcitizens@gmail.com*
**edenenvironmental.org**

vernal pools, and tributaries of California, for the benefit of its ecosystems and communities.

EDEN formally registered as a limited liability company (LLC) association with the California Secretary of State on June 22, 2018; however, since at least July 1, 2014, EDEN has existed as an unincorporated environmental citizen's association with members who remain associated with EDEN as of the date of this Notice.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and described in Section II.B, below. EDEN has members throughout California. Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for surfing, kayaking, camping, fishing, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against Cordeiro Vault Co, Inc, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous. As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of Cordeiro Vault Co, Inc to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the State in which the violations occur.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility. After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN intends to file suit in federal court against the Discharger under CWA section 505(a) for the violations described more fully below.

## I.      THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ

("1997 Permit") and by Order No. 2014-0057-DWQ ("2015 Permit") (collectively, the "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that on or around September 24, 2001, Cordeiro Vault Co, Inc submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility. On or around August 14, 2015, Cordeiro Vault Co, Inc submitted an NOI to be authorized to discharge storm water from the Facility under the 2015 Permit. Cordeiro Vault Co, Inc's assigned Waste Discharger Identification number ("WDID") is *WDID*: 2 48I016830

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, Cordeiro Vault Co, Inc has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377; the General Permit, the Regional Water Board Basin Plan, the California Toxics Rule (CTR) 40 C.F.R. § 131.38, and California Code of Regulations, Title 22, § 64431.

## II.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.  **The Facility**

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Cordeiro Vault Co, Inc's permanent facility address of 495 Ryder Street in Vallejo, California.

Cordeiro Vault Co, Inc Facility is an establishment primarily engaged in manufacturing concrete products, except block and brick, from a combination of cement and aggregate.

Facility operations are covered under Standard Industrial Classification Code (SIC):

### **3272- Concrete Products, except Block and Brick**

Required SIC Code Parameters:

### **Iron (Fe)**

Based on the EPA's Industrial Storm Water Fact Sheet for Sector E - Glass, Clay, Cement, Concrete, and Gypsum Product Manufacturing Facilities**,** polluted discharges from operations at the Facility contain pH affecting substances; metals, such as iron and aluminum; toxic metals, such as lead, zinc, cadmium, chromium, and arsenic; chemical oxygen demand ("COD"); biochemical oxygen demand ("BOD"); total suspended solids ("TSS"); benzene; gasoline and diesel fuels; fuel additives; coolants; and oil and grease ("O&G"). Many of these

pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm.

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B.   The Affected Receiving Waters

The Facility discharges into a municipal storm drain system, which then discharges to the Napa River, then into the San Pablo Bay, a tributary of the San Francisco Bay ("Receiving Waters").

The San Francisco Bay is a water of the United States.  The CWA requires that water bodies such as the San Francisco Bay meet water quality objectives that protect specific "beneficial uses."  The Regional Water Board has issued the *San Francisco Bay Basin Water Quality Control Plan* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Receiving Waters downstream of the Facility include: commercial and sport fishing, estuarine habitat, fish migration, navigation, preservation of rare and endangered species, water contact and noncontact recreation, shellfish harvesting, fish spawning, and wildlife habitat.   Contaminated storm water from the Facility adversely affects the water quality of the San Francisco Bay watershed and threatens the beneficial uses and ecosystem of this watershed.

Furthermore, the San Francisco Bay is listed for water quality impairment on the most recent 303(d)-list for the following: chlordane; dichlorodiphenyltrichloroethane (DDT); dieldrin; dioxin compounds (including 2,3,7,8- tetrachlorodibenzo-pdioxin); furan compounds; invasive species; mercury; polychlorinated biphenyls (PCBs); PCBs (dioxin-like); selenium, and trash.

Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

### III.      VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

#### A.   *Deficient/Invalid SWPPP and/or Site Map*

Cordeiro Vault Co, Inc's current Storm Water Pollution Prevention Plan ("SWPPP") and Site Map for the Facility are both inadequate and fail(s) to comply with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as follows:

(a) The Site Map does not include the minimum required components for Site Maps as indicated in Section X.E of the General Permit.  Specifically, the Site Map fails to include the following:

    1) notes, legends, a north arrow and other data to ensure the map is clear, legible and understandable;

    2) the facility boundary;

    3) storm water drainage areas within the facility boundary and portions of any drainage area impacted by discharges from surrounding areas;

    4) the flow direction of each drainage area;

    5) on-facility surface water bodies, if any;

    6) areas of soil erosion, if any;

    7) nearby water bodies such as rivers, lakes and creeks;

    8) or municipal storm drain inlets that may receive the facility's industrial storm water discharges and authorized NSWDs;

    9) sample locations if different than the identified discharge locations;

    10) locations and descriptions of structural control measures that affect industrial storm water discharges, authorized Non Storm Water Discharges (NSWD's) and/or run-on, if any;

    11) identification of all impervious areas of the facility, including paved areas, buildings, covered storage areas or other roofed structures;

    12) locations where materials are directly exposed to precipitation and the locations where identified significant spills or leaks have occurred;

    13) all areas of industrial activity subject to the General Permit.

(b) The SWPPP does not indicate the **Facility name and contact information** (Section X.A.1);

(c) The SWPPP omits the **date that it was initially prepared** (Section X.A.10);

(d) The SWPPP fails to include the **date of each SWPPP Amendment** (Section X.A.10);

(e)  The SWPPP is invalid because it was **not certified and submitted by the Facility's Legally Responsible Person.**  In fact, the SWPPP was not certified by anyone.  Pursuant to Section XII.K of the General Permit, all Permit Registration Documents (PRDs), including SWPPPs, must be certified and submitted by the Facility's authorized Legally Responsible Person;

(f)  The SWPPP fails to document the facility's **scheduled operating hours**, including irregular operating hours (i.e. temporary, intermittent, seasonal, weather dependent) (Section X.D.2.d);

(g)  The SWPPP fails to include an appropriate discussion of the **Industrial Materials** handled at the facility, including the locations where the materials are stored, received, shipped and handled, and the quantities and handling frequency of the Industrial Materials (Sections X.A.3, X.F, X.G.1.a);

(h)  The SWPPP fails to discuss in detail **Facility operations and all industrial processes** at the facility, including manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to each industrial process; and the type, characteristics, and approximate quantity of industrial materials used in or resulting from the process. Areas protected by containment structures and the corresponding containment capacity are also required to be identified and described. (X.G.1.a);

(i)  The SWPPP fails to include an adequate description of **Potential Pollutant Sources** and narrative assessment of all areas of industrial activity with potential industrial pollutant sources, including Industrial Processes, Material Handling and Storage Areas, Dust and Particulate Generating Activities, Significant Spills and Leaks, Non-Storm Water Discharges and Erodible Surfaces (Section X.G);

(j)  The **Minimum Best Management Practices** (BMPs) as indicated in the SWPPP are insufficient and do not comply with the minimum required categories as listed in the General Permit, which include Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program and Quality Assurance and Record Keeping (Section X.H.1);

(k)  The **Advanced BMP**s as identified in the SWPPP are inadequate to comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in the Facility's storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability, including Exposure Minimization BMPs, Storm

Water Containment and Discharge Reduction BMPs or Treatment Control BMPs (Section X.H.2);

(l) The SWPPP fails to include a **BMP Summary Table** summarizing each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants and the BMPs being implemented (Section X.H.4 and X.H.5);

(m) The SWPPP fails to identify all **Non-Storm Water Discharges (NSWD**s) sources and drainage areas, including an evaluation of all drains (inlets and outlets) that identifies connections to the storm water conveyance system, and a description of how all unauthorized NSWDs have been eliminated (Section X.G.e);

(n) The SWPPP fails to include an appropriate **Monitoring Implementation Plan**, including an identification of team members assigned to conduct monitoring requirements, a description of all discharge locations, a discussion of Visual Observation procedures, justifications for alternative discharge locations, if any, procedures for field instrument calibration instructions, and an example Chain of Custody form to be used when handling and shipping water quality samples to the lab (Section X.I);

(o) The SWPPP fails to include an adequate discussion of the **Facility's receiving waters** (Section XI.B.6(e), Section X.G.2.ix);

(p) The SWPPP does not contain the proper **sampling parameters** for the Facility's SIC Code (Section XI.B.6.d, Table 1, Section XI);

(q) The SWPPP does not contain the proper **sampling parameters** that include all potential pollutants present at the facility due to its industrial operations and industrial materials present at the facility (Section XI.B.6);

(r) The SWPPP does not contain the proper **sampling frequency information** (Section XI.B);

(s) The SWPPP fails to include an appropriate discussion of **Visual Observations** which must be performed at least once every calendar month (Section XI.A);

(t) The SWPPP fails to include detailed information about its **Pollution Prevention Team** (Section X.D);

(u) The SWPPP fails to discuss the **Annual Comprehensive Facility Compliance Evaluation** (Section X.A.9).

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### B. *Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit*

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.  An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1. Failure to Conduct Visual Observations

Section XI(A) of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor and the source of any pollutants.   Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges.

EDEN believes that between July 1, 2015, and the present, Cordeiro Vault Co, Inc has failed to conduct monthly and sampling visual observations pursuant to Section XI(A) of the General Permit.

2. Failure to Collect and Analyze the Required Number of Storm Water Samples

In addition, EDEN alleges that Cordeiro Vault Co, Inc has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

As of the date of this Notice, Cordeiro Vault Co, Inc has failed to upload into the SMARTS database system:

a.      One storm water sample analysis for the time period July 1, 2015, through December 31, 2015;

b.      Two storm water sample analyses for the time period July 1, 2017, through December 31, 2017;

c.      One storm water sample analysis for the time period July 1, 2018, through December 31, 2018.

d.      One storm water sample analysis for the time period January 1, 2019, through June 30, 2019;

e.      One storm water sample analysis for the time period July 1, 2019, through December 31, 2019;

f.      One storm water sample analysis for the time period January 1, 2020, through June 30, 2020.

g.      One storm water sample analysis for the time period July 1, 2020, through December 31, 2020;

h.      Two storm water sample analyses for the time period January 1, 2021, through June 30, 2021.

i.      Two storm water sample analyses for the time period January 1, 2022, through June 30, 2022.

*(A Chart of the above narration is provided for further reference)*

| Reporting Year | QSE's Sampled in First Half | QSE's Sampled in Second Half |
|---|---|---|
| 2015-16 | 1 | 2 |
| 2016-17 | 2 | 2 |
| 2017-18 | 0 | 3 |
| 2018-19 | 1 | 1 |
| 2019-20 | 1 | 1 |
| 2020-21 | 1 | 0 |
| 2021-22 | 2 | n/a |
| Total Sampled | 8 | 9 |

| | | |
|---|---|---|
| QSE's Required | 14 | 12 |
| **QSE's Missing** | **6** | **3** |

In summary, the Discharger has failed to upload **6** samples during the first half of the Reporting Year, and **3** samples during the second half of the Reporting Year.

Furthermore, pursuant to data collected from the National Oceanic and Atmospheric Administration ("NOAA"), there were sufficient storm events occurring near 495 Ryder Street in Vallejo during Facility operating hours within the reporting years where required stormwater sample collections were missed to have allowed the Facility to collect at least the minimum number of storm water samples required by the General Permit.

3. Failure to Collect Storm Water Run-Off Samples during Qualified Storm Events

Pursuant to Section XI.B.1 of the General Permit, a Qualified Storm Event (QSE) is a precipitation event that both produces a discharge for at least one drainage area at the Facility and is also preceded by 48 hours with no discharge from any drainage area.

The General Permit defines "drainage area" as the "area of land that drains water, sediment, pollutants, and dissolved materials to a common discharge location." Attachment C to General Permit-Glossary)

Cordeiro Vault Co, Inc's samples collected as listed below are not in compliance with the General Permit because they were not collected during Qualified Storm Events as defined by the General Permit:

| Sample Date | QSE Info |
|---|---|
| 12/24/2015 | Not a valid QSE – not preceded by 48 hours of no discharge |
| 12/15/2016 | Not a valid QSE – 2nd consecutive day of rainfall |
| 01/10/2017 | Not a valid QSE – 4th consecutive day of rainfall |
| 03/02/2018 | Not a valid QSE – 3rd consecutive day of rainfall |
| 04/16/2018 | Not a valid QSE – 2nd consecutive day of rainfall |
| 11/29/2018 | Not a valid QSE – 3rd consecutive day of rainfall |

4. Failure to Deliver Samples to a Laboratory within 48 Hours of Collection

Pursuant to Attachment H, Section 2 of the General Permit, Dischargers are to deliver storm water run-off samples to a qualified Laboratory within 48 hours of the date and time of physical sampling. The relinquished and received dates of samples listed below were not able to be determined due to the Discharger failing to upload the required Chain of Custody forms.

5.   Failure to Upload Storm Water Sample Analyses within 30 Days

Section XI.B.11.a of the General Permit requires Dischargers to submit all sampling and analytical results for all individual or Qualified Combined Samples via SMARTS within 30 days of obtaining all results for each sampling event. According to a publication by State Water Resources Control Board titled: *Discharger's Guide To The SMARTS Database – Ad Hoc Monitoring Report*[1], an Ad Hoc Report is used to submit monitoring results through SMARTS. In addition, only the LRP or the DAR may certify and submit these reports. A Discharger must manually enter these results in the SMARTS system as referenced in the publication. It is not sufficient to simply upload laboratory reports.

Cordeiro Vault Co, Inc failed to upload into SMARTS within 30 days the following sampling and analytical results pursuant to Section XI.B.11.a of the General Permit:

| Sample Date | Date of Laboratory Report | Date Uploaded into SMARTS | Number of Days Late |
|---|---|---|---|
| 12/24/2015 | 01/07/2016 | 06/20/2016 | 135 |
| 01/13/2016 | 01/26/2016 | 06/20/2016 | 116 |
| 03/04/2016 | 03/14/2016 | 06/20/2016 | 68 |
| 01/10/2017 | 01/30/2017 | 03/21/2017 | 20 |
| 04/07/2017 | 04/21/2017 | 07/12/2017 | 52 |
| 01/08/2018 | 01/19/2018 | 06/05/2018 | 107 |
| 03/02/2018 | 03/15/2018 | 06/05/2018 | 52 |
| 04/16/2018 | 05/03/2018 | 07/12/2018 | 40 |
| 11/29/2018 | 12/15/2018 | 07/15/2019 | 182 |
| 01/16/2019 | 02/06/2019 | 07/15/2019 | 129 |
| 12/02/2019 | 12/13/2019 | 06/30/2020 | 170 |
| 03/04/2020 | 04/09/2020 | 07/08/2020 | 60 |
| 12/17/2020 | 12/28/2020 | 06/23/2021 | 147 |
| 10/25/2021 | 11/08/2021 | 03/23/2022 | 105 |
| 11/09/2021 | 11/22/2021 | 03/23/2022 | 91 |

6.   Failure to Upload Collected Samples From Each Drainage Area at all Discharge Locations

Section XI.B.4 of the General Permit requires Dischargers to collect samples from all discharge locations, regardless of whether the discharges are substantially similar.  Dischargers may analyze a combined sample consisting of equal volumes, collected from as many as four substantially similar discharge locations, provided that the Discharger submits a Representative

[1] https://www.waterboards.ca.gov/water_issues/programs/stormwater/docs/dischargers_guide_adhocreport.pdf

Sampling Reduction Justification form with its sample analysis, and the samples are combined in the lab in accordance with Section XI.C.5 of the General Permit. Furthermore, Representative sampling is only allowed for sheet flow discharges or discharges from drainage areas with multiple discharge locations.

According to Rich Doss, Inc.'s Laboratory Results, the Facility has 3 discharge locations, identified by several names. We shall refer to them as "Outfall #1" and "Outfall #2", and "Outfall #3". ***All*** of the Discharger's samples uploaded to the SMARTS system failed to contain sample results from Outfall #1. However, further research has made it apparent that the same Laboratory Form was used for both Facilities operated by Cordeiro Vault Co. Inc. This Facility, and the Facility located at 281 5th St Vallejo California 94590 used the same report. However, Outfall #1 is assumed to be present at the 5th Street Facility due to the result being uploaded on the SMARTS System using the WDID# (2 48I016831) for the 5th Street Facility.

7. <u>Failure to Analyze Storm Water Samples for the Correct Parameters</u>

General Permit sections XI.B.6.a and XI.B.6.b require all Dischargers to analyze for the following three parameters, regardless of facility type: pH, Total Suspended Solids (TSS) and Oil & Grease (O&G).

Section XI.B.6.d of the General Permit requires additional applicable parameters listed in Table 1 of the General Permit (Additional Analytical Parameters), which are related to the facility's Standard Industrial Classification (SIC) code(s). The Facility's SIC Code is <u>3272-Concrete Products, except Block and Brick</u>, requiring it to include the following as mandatory sampling parameters: **Iron (Fe).** The Discharger failed to analyze samples for Iron in *ALL* of the samples uploaded into the SMARTS system.

Section XI.B.6.c of the General Permit requires Dischargers to analyze for any additional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment contained in the Facility's SWPPP. However, the Facility's SWPPP does not contain a Pollutant Source Assessment. However, the Facility Site Map indicates there is an Underground Storage Tank containing 1,000 gallons of Deisel Fluid and 500 gallons of Gasoline.

The following additional parameters are to be included in the sampling process, as they are associated with the Facility's industrial operations: **TPH Deisel & TPH Gasoline.**

In addition, the Discharger failed to analyze samples for pH for the samples taken on 04/16/2018.

### C. ***Discharges In Violation of the General Permit***

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition Section III(B) of the General Permit prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition Section III(B) of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

1. Discharges in Excess of Technology-Based Effluent Limitations

The Industrial General Permit includes technology-based effluent limitations, which prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. (Section X.H.)

The EPA has published Benchmark values set at the maximum pollutant concentration levels present if an industrial facility is employing BAT and BCT, as listed in Table 2 of the General Permit. The General Permit includes "Numeric Action Levels" ("NALs") derived from these Benchmark values; however, the NALs do not represent technology-based criteria relevant to determining whether an industrial facility has implemented BMPs that achieve BAT/BCT. (Section I.M. (Finding 62)).

Cordeiro Vault Co, Inc's exceedances of Benchmark values identified in the table listed below, indicate that it has failed and is failing to employ measures that constitute BAT and BCT, in violation of the requirements of the Industrial General Permit. EDEN alleges and notifies Cordeiro Vault Co, Inc that its storm water discharges from the Facility have consistently contained and continue to contain levels of pollutants that exceed Benchmark values as listed below.

These allegations are based on the Facility's self-reported data submitted to the Regional Water Board. Self-monitoring reports under the Permit are deemed "conclusive evidence of an

exceedance of a permit limitation." *Sierra Club v. Union Oil,* 813 F.2d 1480, 1492 (9th Cir. 1988).

Cordeiro Vault Co, Inc's ongoing discharges of storm water containing levels of pollutants above EPA Benchmark values and BAT- and BCT-based levels of control also demonstrate that it has not developed and implemented sufficient BMPs at the Facility. EPA Benchmarks are relevant to the inquiry as to whether a facility has implemented BMPs. [*Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC* (E.D.Cal. 2016) 205 F.Supp.3d 1128; *Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 925; *Waterkeepers Northern California v. AG Industrial Mfg. Inc.* (9th Cir. 2004) 375 F.3d 913, 919 (concentration levels in excess of EPA benchmarks are evidence supporting the citizen plaintiff's contention that defendant did not have appropriate BMPs to achieve BAT/BCT).]

Cordeiro Vault Co, Inc's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

## 2. Discharges in Excess of Receiving Water Limitations

In addition to employing technology based effluent limitations, the Industrial General Permit requires dischargers to comply with Receiving Water Limitations. Receiving Water Limitations found in Section VI(B) of the General Permit prohibit storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment.

Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment also constitute violations of the General Permit Receiving Water Limitation.

Applicable Water Quality Standards ("WQS") are set forth in the California Toxics Rule ("CTR") and the Regional Basin Plan. Exceedances of WQS are violations of the Industrial General Permit, the CTR, and the Basin Plan. Industrial storm water discharges must strictly comply with WQS, including those criteria listed in the applicable Basin Plan. (See *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).)

The Basin Plan establishes WQS for the San Francisco Bay and its tributaries, including but not limited to the following:

- Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses.

- Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

- Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

- All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms.

- Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.

Information available to EDEN indicates that the Facility's storm water discharges contain elevated concentrations of specific pollutants, as listed below.   These polluted discharges can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters.  Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health.  These harmful discharges from the Facility are violations of the General Permit Receiving Water Limitation.

Further, EDEN puts Cordeiro Vault Co, Inc on notice that the Receiving Water Limitations are independent requirements that must be complied with, and that carrying out the process triggered by exceedances of the NALs listed at Table 2 of the General Permit does not amount to compliance with the Receiving Water Limitations.  The NALs do not represent water quality-based criteria relevant to determining whether an industrial facility has caused or contributed to an exceedance of a WQS, or whether it is causing adverse impacts to human health or the environment.

Section XX.B. of the General Permit provides that when a facility's industrial storm water discharges and/or authorized Non Storm Water Discharges (NSWD's) are determined to contain pollutants that are in violation of Receiving Water Limitations contained in Section VI, the Discharger must conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP have been properly implemented, assess its current SWPPP, and certify via SMARTS any additional BMPs identified which are necessary in order to meet the Receiving Water Limitations.

EDEN alleges that from at least January 8, 2018, to the present, Cordeiro Vault Co, Inc has been in violation of the Receiving Water Limitations provision of Section VI of the General Permit, as evidenced by its exceedances of the applicable Water Quality Standards set forth in the Regional Basin Plan, indicated below.

Further, Cordeiro Vault Co, Inc has failed to comply with Section XX.B of the General Permit.  Failure to comply with the additional Water Quality-Based Corrective Action requirements listed in Section XX.B is an additional violation of the General Permit.

The following discharges of pollutants from the Facility have violated Discharge Prohibitions and Receiving Water Limitations of the General Permit and are evidence of ongoing violations of Effluent Limitations:

| Sample Date | Parameter | Units | Result | IGP NAL average/ instantaneous Value[1] | Sample Location |
|---|---|---|---|---|---|
| 1/8/2018 | Oil and Grease | mg/L | 2.30 | 25 | #2 NW Outfall |
| 1/8/2018 | pH | SU | 8.90 | <6 or >9 | #2 NW Outfall |
| 1/8/2018 | Total Suspended Solids (TSS) | mg/L | 93.00 | 400 | #2 NW Outfall |
| 1/8/2018 | Oil and Grease | mg/L | 5.50 | 25 | #3 SE Outfall |
| 1/8/2018 | pH | SU | 7.30 | <6 or >9 | #3 SE Outfall |
| 1/8/2018 | Total Suspended Solids (TSS) | mg/L | 37.00 | 400 | #3 SE Outfall |
| 3/2/2018 | Oil and Grease | mg/L | 2.00 | 25 | #2 NW Outfall |
| 3/2/2018 | pH | SU | 2.00 | <6 or >9 | #2 NW Outfall |
| 3/2/2018 | Total Suspended Solids (TSS) | mg/L | 0.00 | 400 | #2 NW Outfall |
| 3/2/2018 | Oil and Grease | mg/L | 5.70 | 25 | #3 SE Outfall |
| 3/2/2018 | pH | SU | 2.00 | <6 or >9 | #3 SE Outfall |
| 3/2/2018 | Total Suspended Solids (TSS) | mg/L | 393.00 | 400 | #3 SE Outfall |
| 4/16/2018 | Oil and Grease | mg/L | 4.00 | 25 | #2 NW Outfall |
| 4/16/2018 | Total Suspended Solids (TSS) | mg/L | 36.00 | 400 | #2 NW Outfall |
| 4/16/2018 | Oil and Grease | mg/L | 0.00 | 25 | #3 SE Outfall |
| 4/16/2018 | Total Suspended Solids (TSS) | mg/L | 14.00 | 400 | #3 SE Outfall |

| RY 2017-2018 Averages | | | | | |
|---|---|---|---|---|---|
| IGP Exceedance / Basin Plan / Both | Contaminant | Unit | Value | NAL Benchmark | Basin Plan (*1hr average*) |
| | Oil and Grease | mg/L | 3.25 | 15.00 | n/a |
| | pH | SU | 5.05 | <6 or >9 | n/a |
| | Total Suspended Solids (TSS) | mg/L | 95.50 | 100.00 | n/a |

| Sample Date | Parameter | Units | Result | IGP NAL average/ instantaneous Value[1] | Sample Location |
|---|---|---|---|---|---|
| 12/17/2020 | Oil and Grease | mg/L | 0.00 | 25 | #2 NW Outfall |
| 12/17/2020 | pH | SU | 8.00 | <6 or >9 | #2 NW Outfall |
| 12/17/2020 | Total Suspended Solids (TSS) | mg/L | 79.00 | 400 | #2 NW Outfall |
| 12/17/2020 | Oil and Grease | mg/L | 2.80 | 25 | #3 SE Outfall |
| 12/17/2020 | pH | SU | 7.00 | <6 or >9 | #3 SE Outfall |
| 12/17/2020 | Total Suspended Solids (TSS) | mg/L | 348.00 | 400 | #3 SE Outfall |
| | **RY 2020-2021 Averages** | | | | |

| IGP Exceedance / Basin Plan / Both | Contaminant | Unit | Value | NAL Benchmark | Basin Plan (*1hr average*) |
|---|---|---|---|---|---|
| | Oil and Grease | mg/L | 1.40 | 15.00 | n/a |
| | pH | SU | 7.50 | <6 or >9 | n/a |
| | Total Suspended Solids (TSS) | mg/L | 213.50 | 100.00 | n/a |

A summary of the results is provided herein:

During the 2017-18 Reporting Year, Discharger exceeded the Instantaneous Maximum NAL for pH of Less than 6.0 Greater than 9.0 SU. Outfalls #2 and #3 were sampled. Results from each outfall were 2.0 SU.

Furthermore, during the 2020-21 Reporting Year, the Discharger exceeded the NAL value for TSS of 100 mg/L. The averaged values for the sampling results for said reporting year was 213.50 mg/L.

### D.  *Failure to Comply with Exceedance Response Action Requirements*

As of July 1, 2015, the date the current General Permit became effective, all Dischargers were in "Baseline status" for all parameters listed in Table 2 of the Permit.   (Section XII.B).

Pursuant to Section XII.C of the General Permit, a Discharger's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate either an annual average or instantaneous NAL exceedance for that same parameter.

Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the Discharger enters the Exceedance Response Action ("ERA") process.  The ERA process requires the discharger to conduct a Level 1 ERA Evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the Facility that are or may be related to the NAL exceedance(s), by October 1 following commencement of Level 1 status.

The Level 1 ERA Evaluation must include the identification of the corresponding BMPs in the SWPPP, as well as any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit.

Based upon the Level 1 ERA Evaluation, the Discharger is required to, as soon as practicable, but no later than January 1 following commencement of Level 1 status, prepare a Level 1 ERA Report.  (Section XII.C.2).  The Level 1 Report must be prepared by a QISP and include a summary of the Level 1 ERA Evaluation, a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL.

The SWPPP revisions and additional BMP development and implementation must also be completed by January 1, and the Level 1 status discharger is required to submit via SMARTs the Level 1 ERA Report certifying that the Level 1 ERA Evaluation has been conducted, and necessary SWPPP revisions and BMP implementation has been completed.  The certification also requires the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status.

A Discharger's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter.

A Discharger will enter Level 2 status if there is an NAL exceedance of the same parameter occurring during the time the Discharger is in Level 1 status.

1. Failure to Submit Level 1 ERA Report *(for pH)*

Based on the sample data summarized above, the Facility exceeded the EPA Benchmark NAL for pH for the reporting year 2017-18.  These results elevated Cordeiro Vault Co, Inc.  to Level 1 Status on July 1, 2018, pursuant to Section XII.C – Exceedance Response Actions -- of the General Permit.

Pursuant to Section XII(C)(2) of the General Permit, the Facility was required to have a QISP conduct an evaluation of the Facility by October 1, 2018, and to upload an adequate Level 1 ERA Report on or before January 1, 2019.

As of the date of this Notice, EDEN alleges that Cordeiro Vault Co, Inc.  has failed to conduct an adequate Level 1 status evaluation and has also failed to submit a Level 1 ERA report by uploading it into the SMARTS system.

   2.  <u>Failure to Submit Level 1 ERA Report</u> *(for TSS)*

Based on the sample data summarized above, the Facility exceeded the EPA Benchmark NAL for pH for the reporting year 2020-21.  These results elevated Cordeiro Vault Co, Inc.  to Level 1 Status on July 1, 2021, pursuant to Section XII.C – Exceedance Response Actions -- of the General Permit.

Pursuant to Section XII(C)(2) of the General Permit, the Facility was required to have a QISP conduct an evaluation of the Facility by October 1, 2021, and to upload an adequate Level 1 ERA Report on or before January 1, 2022.

As of the date of this Notice, EDEN alleges that Cordeiro Vault Co, Inc.  has failed to conduct an adequate Level 1 status evaluation and has also failed to submit a Level 1 ERA report by uploading it into the SMARTS system.

### E.   *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that Cordeiro Vault Co, Inc has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges.  Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

Cordeiro Vault Co, Inc's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

### F.   *Failure to Update SWPPP*

As discussed above, the Facility entered Level 1 Status on July 1, 2018, and on July 1, 2021.  The Level 1 ERA Report was not prepared or uploaded. Pursuant to IGP Section

XII.C.2.a of the General Permit, the Discharger would have been required to make BMP recommendations and update its SWPPP on or before January 1, 2019, and January 1, 2022.

As of the date of this Notice, Cordeiro Vault Co, Inc has failed to upload an amended SWPPP pursuant to Sections X.B and XII.C.2.a of the General Permit.

As of the date of this Notice, Cordeiro Vault Co, Inc has failed to upload an adequate revised SWPPP pursuant to the General Permit.

### G. *Falsification of Stormwater Reports Submitted to the Regional Water Board*

Section XXI.L of the General Permit provides as follows:

### L. Certification

Any person signing, certifying, and submitting documents under Section XXI.K above shall make the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

Further, Section XXI.N of the General Permit provides as follows:

### N. Penalties for Falsification of Reports

Clean Water Act section 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both.

Mr. Daniel Cordeiro submitted laboratory results via the Ad Hoc Monitoring Reporting System that contained duplicated values. The results from samples taken on 01/13/2016 and 03/04/2016 from "#2 NW Outfall" were entered twice. These values altered the automatic calculation of overall results of the reporting year by the SMARTS system to determine if any NAL exceedances occurred.

### H.  Falsification of Annual Reports Submitted to the Regional Water Board

On June 27, 2016, July 13, 2017, July 15, 2018, July 15, 2019, and July 10, 2020, Cordeiro Vault Co, Inc submitted its Annual Report(s) for the Fiscal Year(s) 2015-16 through 2019-20.  Mr. Daniel Cordeiro signed the Report(s) under penalty of law.  Mr. Cordeiro is the current Legally Responsible Person ("LRP") for Cordeiro Vault Co, Inc.

Mr. Cordeiro responded "Yes" to Question No. 3 on the Annual Report(s) ("Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?")  However, as discussed above, Cordeiro Vault Co, Inc failed to collect and analyze the required number of storm water samples during the reporting year(s) in question.

On June 01, 2021, Cordeiro Vault Co, Inc submitted its Annual Report(s) for the Fiscal Year 2020-21.  Mr. Daniel Cordeiro signed the Report(s) under penalty of law.  Mr. Cordeiro is the current Legally Responsible Person ("LRP") for Cordeiro Vault Co, Inc.

The Annual Report(s) included Attachment 1 as an explanation for why Cordeiro Vault Co, Inc. failed to sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B. Mr. Cordeiro certified in the Report(s), under penalty of perjury, that the required number of samples were not collected by the Facility because allegedly there were insufficient qualifying storm water discharges during the reporting year(s) and scheduled facility operating hours.

However, records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years in question there were in fact sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Cordeiro Vault Co, Inc. to collect the requisite number of samples.

### I.  Failure to Comply with the Mandates of the Regional Water Board

Pursuant to Section XIX of the General Permit, Regional Water Boards have general authority to enforce the provisions and requirements of the General Permit, including reviewing SWPPPs, Monitoring Implementation Plans, ERA Reports, and Annual Reports and requiring Dischargers to revise and re-submit PRDs, conducting compliance inspections, and taking enforcement actions.

The Regional Water Quality Control Board issued Cordeiro Vault Co, Inc a Notice of Violation on October 21, 2021, for Failure to Submit Industrial Stormwater Exceedance Response Action Reports, requiring that the Facility submit the Late Level 1 ERA reports immediately.

Cordeiro Vault Co, Inc has failed to comply with those mandates as of the date of this Notice.

### J.   *Failure to Properly Train Employees/Facility Pollution Prevention Team*

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

Based on the foregoing violations, it is clear that Cordeiro Vault Co, Inc has either not properly established its Pollution Prevention Team, or has not adequately trained its Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

Cordeiro Vault Co, Inc may have had other violations that can only be fully identified and documented once discovery and investigation have been completed.  Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

### IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The entities responsible for the alleged violations are Cordeiro Vault Co, Inc and employees of the Facility responsible for compliance with the CWA.

### V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is from at least February 19, 2016, to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

### VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is Eden Environmental Citizen's Group ("EDEN").

Aiden Sanchez
EDEN ENVIRONMENTAL CITIZEN'S GROUP
730 2nd Street #3135
Santa Rosa, CA 95402
Telephone: (707) 241-3529
Email:  Edenenvcitizens@gmail.com  (emailed correspondence is preferred)
Website: edenenvironmental.org

EDEN has retained counsel in this matter as follows:

CRAIG A. BRANDT
Attorney at Law
5354 James Avenue
Oakland CA, 94618
Telephone: (510) 601-1309
Email:  craigabrandt@att.net

To ensure proper response to this Notice, all communications should be addressed to EDEN's legal counsel, Mr. Craig A. Brandt.

## VII.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law authorize civil penalties of $37,500.00 per day per violation for all Clean Water Act violations after January 12, 2009, and $51,570.00 per day per violation for violations that occurred after November 2, 2015.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

**Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d) and California Code of Civil Procedure §1021.5, EDEN will seek to recover its pre and**

**post-litigation costs, including all attorneys' and experts' fees and costs incurred** (see *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017) 853 F.3d 1076; *Vasquez v. State of California* (2008) 45 Cal.4th 243).

## VIII.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages Cordeiro Vault Co, Inc's counsel to contact **EDEN's counsel** within 20 days of receipt of this Notice to initiate a discussion regarding the violations detailed herein.  Please do not contact EDEN directly.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if Cordeiro Vault Co, Inc wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.  EDEN reserves the right to file a lawsuit if discussions are continuing when the notice period ends.

Very truly yours,

AIDEN SANCHEZ
Eden Environmental Citizen's Group
Copies to:

Michael S. Regan, Administrator
U.S. Environmental Protection Agency:
Regan.Michael@epa.gov
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Regional Administrator, U.S. EPA – Region 9
Martha Guzman
75 Hawthorne Street
San Francisco, CA, 94105
r9.info@epa.gov

Eileen Sobeck, Executive Director
State Water Resources Control Board:
P.O. Box 100
Sacramento, CA 95812-0100
eileen.sobeck@waterboards.ca.gov

Matthias St. John, Executive Officer
North Coast Regional Water Quality Control Board:
5550 Skylane Blvd Ste A
Santa Rosa, CA 95403-1072
Matt.St.John@waterboards.ca.gov

California Water Boards Stormwater Program
stormwater@waterboards.ca.gov